**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2023 MAY 10  AM 9: 35

CLERK

BY _____
DEPUTY CLERK

| | |
|---|---|
| TYLER BAKER, individually and on behalf of The University of Vermont Medical Center 403(b) Plan, <br><br>                                Plaintiff, <br><br>       v. <br><br>THE UNIVERSITY OF VERMONT MEDICAL CENTER, INC., the BOARD OF TRUSTEES OF THE UNIVERSITY OF VERMONT MEDICAL CENTER, the DC FIDUCIARY INVESTMENT COMMITTEE, and JOHN DOES 1-45, <br><br>                            Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br>Civil Action No.<br><br>2:23-CV-87 |

## CLASS ACTION COMPLAINT

Plaintiff Tyler Baker ("Plaintiff"), by and through his attorneys, on behalf of The University of Vermont Medical Center 403(b) Plan (the "Plan"),[1] themselves and all others similarly situated, allege as follows:

### I.    INTRODUCTION

1.    Plaintiff brings this class action pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include The University of Vermont Medical Center, Inc.

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

("UVMC"), the Board of Trustees of The University of Vermont Medical Center during the Class Period[2] ("Board") and its members, and the DC Fiduciary Investment Committee ("Committee"), and its members, for breaches of their fiduciary duties during the Class Period. UVMC, the Board, and the Committee are referred to collectively as "Defendants".

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009).

3.      The U.S. Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."[3]

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of services to the plan and investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the

---

[2] The "Class Period" is defined as May 10, 2017, through the date of judgment.

[3] U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at n.3, available at A Look at 401(k) Plan Fees (dol.gov) (last visited April 17, 2023).

investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA"), § 7.[4]

5.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[5]

6.    Additional fees of only 0.18% or 0.4% can have a large impact on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.    Most participants in 401(k) and 403(b) plans expect that their 401(k) or 403(b) accounts will be their principal source of income after retirement. Although 401(k) and 403(b) accounts are fully funded at all times, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

---

[4] *See also A Look at 401(k) Plan Fees*, at 2 ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").
[5] *See also A Look at 401(k) Plan Fees*, at 2 ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

8.    At all times during the Class Period, the Plan's assets were entrusted to the care of Defendants – the Plan's fiduciaries. As of December 31, 2017 (the end of the first year of the Class Period), the Plan had net assets of more than $1.17 billion and 11,200 participants with account balances. *See* Form 5500 for 2017. As of December 31, 2021 (the most recently reported financials at the time this case was commenced), the Plan had net assets available for benefits of more than $1.76 billion and 12,387 participants with account balances. *See* Form 5500 for 2021.

9.    The Plan's assets under management qualifies it as a mega plan in the defined contribution plan marketplace. As a mega plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. For example, according to Morningstar Inc. research, participants in small, defined-contribution plans with assets totaling $25 million or less, on average, pay 84 basis points on investment fees, while participants in plans with more than $500 million pay just 40 basis points.[6] Defendants, however, *inter alia*, failed to exercise appropriate judgment and permitted the Plan's service providers to charge excessive administrative fees and expenses.

10.    During the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by failing to adequately monitor and control the Plan's recordkeeping costs.

---

[6] *See* Morningstar, "2003 Retirement Plan Landscape Report," available at https://www.morningstar.com/lp/retirement-plan-landscape-2023, last visited April 17, 2023.

11.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

12.     Based on this conduct, Plaintiff asserts claims against Defendants for breach of the fiduciary duties of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

14.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

15.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.    PARTIES

**Plaintiff**

16.    Plaintiff Tyler Baker ("Baker") resides in Underhill, Vermont. Plaintiff Baker enrolled in the Plan prior to ***September 30, 2016***.  Throughout his participation in the Plan, Plaintiff Baker paid the recordkeeping and administrative costs associated with the Plan that are complained of herein. In addition, Plaintiff Baker invested in certain of the options offered by the Plan that are the subject of this lawsuit, including various collections of mutual funds and variable annuities offered by entities such as TIAA-CREF, T. Rowe Price, Fidelity and Vanguard and guaranteed investment accounts offered by entities including Sun America.

17.    Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan, paid the recordkeeping and administrative costs associated with the Plan that are complained of herein, and was injured by Defendants' unlawful conduct alleged herein. Plaintiff is entitled to receive benefits in the amount of the difference between the value of his account currently, or as of the time his account was distributed, and what his account is or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

18.    Plaintiff did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, and total cost comparisons to similarly-sized plans) necessary to understand that Defendants breached their fiduciary duties and

6

engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**The Sponsor Defendant**

19.    UVMC is an academic medical facility, is the Plan Sponsor, the Plan Administrator (as defined in Section 3(16) of ERISA), and a named fiduciary, with a principal place of business being 111 Colchester Avenue, Burlington, Vermont 05401.

20.    The Company, acting through its Board of Directors, appointed fiduciaries of the Plan, including the Committee. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

21.    UVMC, through its Board, had a fiduciary duty to monitor and supervise the Plan's fiduciaries, including the Committee and its members during the Class Period, but, as set forth in detail below, the Committee failed to carry out these fiduciary duties prudently.

22.    The Plan Administrator has the responsibility for making, and the complete power to make, all discretionary determinations (including, but not limited to, factual determinations) under the Plan, for interpreting Plan provisions, reconciling inconsistencies and all other procedures and processes for the smooth administration and operation of the Plan. Summary Plan Description, at 30.

23.    For the foregoing reasons, at all times during the Class Period, UVMC was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over management or disposition

of Plan assets and because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

### Board Defendants

24.     UVMC, acting through its Board of Trustees, appointed Plan fiduciaries, including the Committee. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

25.     Accordingly, the Board and each of its members during the Class Period (referred to herein as John Does 1-25) is or was a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets and because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

26.     The Board has also exercised discretion to authorize UVMC to contribute annual profit-sharing amounts to the Plan's participants.

### DC Fiduciary Investment Committee Defendant

27.     UVMC has delegated certain administrative and investment related authority and responsibility to the Committee to choose and monitor investment plan options. The Committee and its members are named fiduciaries of the Plan. *See* Investment Policy

Statement, at 2; *see also* University of Vermont Health Center DC Investment Committee Charter, Section I.

28.    The Committee has been delegated "the authority and responsibility for selecting and monitoring the investment funds available under the Plan, for selecting and monitoring Plan vendors and for overseeing the fees and expenses that may be charged under the Plan." Summary Plan Description, at 30.

29.    The "purpose of the Committee is to oversee the investment options available under the retirement Plans and the fees and expenses paid by the Plan in accordance with the Investment Policy Statement for such Plans and the underlying trusts…." University of Vermont Health Center DC Investment Committee Charter, Section I.

30.    The Committee's fiduciary duties and responsibilities with respect to the management and oversight of the Plan include:

- Ensuring fees paid to service providers and other expenses are reasonable;

- Approving the appointment of investment managers for the Plan, and the policies and operating procedures governing investment managers;

- Monitoring the investment performance of the Plan;

- Receiving, reviewing, and maintaining on file reports of investment performance, financial condition, receipts and disbursements of the Plan's assets;

- Appointing and retaining individuals and/or entities to assist in the administration of the Committee's duties under its governing documents; and

- Reporting to the Board.

31.     The Committee exercised this discretionary authority throughout the Class Period. Thus, the Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

32.     Plaintiff does not have access to documents and information sufficient to identify any members of the Committee during the Class Period. Accordingly, the unnamed members of the Committee during the Class Period are referred to herein as John Does 26-35. The Committee and John Does 26-35 are collectively referred to herein as the "Committee Defendants."

33.     As alleged in detail below, the Committee Defendants failed to properly discharge their fiduciary duties and responsibilities during the Class Period.

### John Doe Defendants

34.     To the extent that there are additional committees, officers, employees and/or contractors of UVMC who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation,

unknown "John Doe" Defendants 36-45 include, but are not limited to, UVMC officers,

employees and/or contractors who are/were fiduciaries of the Plan within the meaning of

ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## IV.     CLASS ACTION ALLEGATIONS

35.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of themselves and the following proposed class

("Class"):[7]

> All persons, except Defendants and their immediate family members, and the
> Court and Court staff handling this matter, who were participants in or
> beneficiaries of the Plan at any time between May 10, 2017 through the date
> of judgment (the "Class Period").

36.     The members of the Class are so numerous that joinder of all members is

impractical. As of December 31, 2017, the Plan had 11,200 participants with account

balances. (2017 Form 5500, at 2). As of December 31, 2021 (the most recently reported

financials at the time this case was commenced), the Plan had 12,387 participants with

account balances. (2021 Form 5500, at 2).

---

[7] Plaintiff reserves the right to propose other or additional classes or subclasses in their motion for
class certification or subsequent pleadings in this action. Additionally, although this is a proposed
class action, the allegations in this complaint are alternatively asserted derivatively on behalf of
the Plan because class certification is not necessarily required for Plaintiff to prosecute claims on
behalf of the Plan and all participants. *See, e.g., In re: Wilmington Trust Corp.*, 2013 WL 4757843,
at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all
plan participants without class certification, because of the nature of such claims). ERISA Section
502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan
to recover losses to a plan. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009)
("Courts have recognized that a plaintiff with Article III standing may proceed under § 1132(a)(2)
on behalf of the plan or other participants.").

37. Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plan and has suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiff consistently with other Class members and managed the Plan as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

38. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

    A.    Whether Defendants are/were fiduciaries of the Plan;

    B.    Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

    C.    Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

    D.    The proper form of equitable and injunctive relief; and

    E.    The proper measure of monetary relief.

39. Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is

committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

40.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

41.     In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

42.     The Plan is a qualified defined contribution or individual account retirement plan, which is funded by employer and employee contributions. The Plan is subject to the provisions of ERISA.

43.     The effective date of the UVMC plan is July 1, 1997 (*see* Summary Plan Description, at 35.).

44.     Retirement benefits provided by the Plan are based solely on the amounts contributed to a participant account, and any income or gains (or losses) on such contributions, less any expenses that may be allocated to such participant's account.

45.     UVMC is the Plan Administrator and a named fiduciary of the Plan within the meaning of ERISA Section 402, Summary Plan Description, at 30, 35. Under the Plan Document, the Plan Administrator has total and complete discretionary power and authority with respect to: (a) determining the amount, the form and timing of benefits payable under the Plan; (b) determining the amount and manner of any allocations and/or benefit accruals under the Plan; (c) maintaining and preserving records relating to participants; (d) furnishing participants with information and required notices; (e) preparing and filing with the U.S. Department of Labor all reports and other required information; (f) approving loans; (g) hiring professional assistants and consultants as it deems necessary; (h) arranging for bonding; and (i) communicating with Trustee as it deems appropriate, among other things. 403 (b) Retirement Plan Summary Plan Description, at 30-31.

46.     Fidelity Workplace Services LLC is the Plan's recordkeeper and third-party administrator. Summary Plan Description, 35.

**Eligibility**

47.     In general, all active UVMC employees regardless of employment status are eligible to make personal contributions to the Plan. Employees are eligible to receive an employer matching contribution after completing six months of service and are scheduled

14

to work at least forty authorized hours per pay period. See, Summary Plan Description, at 4 and Notes to Financial Statements for the year ended December 31, 2021, at 6.

**Payment of Plan Expenses**

48.    Defendants disclose very little information to participants concerning the payment of the costs, expenses, and fees incurred in administering the Plan.

49.    All expenses of the Custodian related directly to the acquisition and disposition of investments and any other reasonable expenses of Plan administration may be charged against participants' accounts. 403 (b) Retirement Plan Summary Plan Description, Exhibit A Master Group Custodial Agreement, at 83.

50.    As the Plan Document states, the Plan has discretion to charge each Plan participant for expenses of plan administration, including recordkeeping. However, the disclosures that are provided to Plan participants fail to state the actual amount of plan administrative fees and expenses that have been or will be incurred by each participant.

## VI.    PLAN INVESTMENTS

51.    Defendants exercised and continue to exercise discretionary authority over the investment options that are included in the Plan. The Plan's investments are designated by Defendants as available investment alternatives offered under the Plan.

52.    At all relevant times, Defendants had a fiduciary duty to conduct an independent evaluation to determine that the inclusion of each investment option in the plan's menu is prudent.

53.    **The Default Investment Option.** Defendants have designated the suite of T. Rowe Price Retirement Target Date Funds as the default investment alternative for Plan

participants who do not make an investment election decision. A participant's contributions will be made to the specific T. Rowe Price Retirement I Target Date Fund that corresponds to their date of birth and the assumption that they will retire at age 65.

54. **Fidelity Managed Investment Options.** In addition to the T. Rowe Price Retirement Target Date Funds, the Plan also offers 17 other investment choices managed by Fidelity, which are all mutual funds, and a stable value fund.

55. **BrokerageLink.** Defendants chose Fidelity Brokerage Services, LLC to provide self-directed brokerage accounts to Plan participants through Fidelity's trademarked BrokerageLink® service. As of December 31, 2017, more than $47 million in Plan assets was invested in self-directed funds through BrokerageLink and an additional $4.2 million was held in Fidelity BrokerageLink's Money Market Fund. By December 31, 2021, more than $66 million in Plan assets was invested in self-directed funds through BrokerageLink and an additional $4 million was held in Fidelity BrokerageLink's Money Market Fund.

56. Fidelity has received and continues to receive substantial additional compensation from BrokerageLink, but Defendants have failed to require that the Plan receive a credit for that compensation as an offset to Fidelity's recordkeeping fees. Defendants acted imprudently by failing to account for all the direct and indirect compensation Fidelity received though BrokerageLink.

57. Defendants imprudently failed to design or implement a process to evaluate or control the administrative expenses that the Plan's participants paid to Fidelity, and

imprudently failed to analyze and evaluate compensation paid to Fidelity from investments through BrokerageLink.

**Defendants Imprudently Retained Legacy Investment Options**

58.     Throughout the Class Period, Defendants imprudently retained numerous legacy investment options, which added to the Plan's overall administrative expenses and made the Plan (and its menu of investments) needlessly complex, without adding anything of value for Plan participants.

59.     An investment option is considered a legacy investment if it is held with a terminated provider or in a legacy investment with an approved provider. As *Tibble v. Edison Int'l*, 575 U. S. 523 (2015), instructs, a fiduciary has a continuing obligation to monitor investments and to remove imprudent ones, separate from and in addition to the fiduciary's duty to carefully choose investments in the first instance. *See also Hughes v. Nw. Univ.*, 211 L. Ed. 2d 558, 142 S. Ct. 737, 742 (2022) (stating, "fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options. If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty.") (citation omitted).

60.     Thus, sponsors and fiduciaries of 401(k) and 403(b) plans must prioritize streamlining their legacy plan menu options, and to ensure that they are regularly monitoring all the investment options available and eliminating those that are underperforming or charging higher fees than their benchmarks without a reasonable justification for doing so.

61.     If Defendants had managed the Plan in a prudent manner, they would have mapped outdated, legacy investment options (which were more expensive than comparable investments offered by the Plan) to less expensive comparable investment options offered by the Plan.

62.     **The Legacy TIAA-CREF Investment Options.** The Plan offered ten investments choices managed by TIAA-CREF, including variable annuities, registered investment companies and a pooled separate account.

63.     The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

64.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan. For example, for participants who invest in the TIAA Traditional Annuity through a Group Retirement Annuity contract, like the one held in the Plan, lump-sum withdrawals are available from the Traditional Annuity only within 120 days after termination of employment and are subject to a 2.5% surrender charge. All other withdrawals and transfers from the account must be paid in ten annual installments.  Rather than being available to participants if they wish to liquidate their funds earlier, a participant's investment in the TIAA Traditional Annuity can be withdrawn only over a ten-year period, unless a substantial penalty is paid.

Thus, participants who wish to withdraw their investment without a substantial penalty can only do so over ten years.

65.    The Plan's CREF Stock Account R2, CREF Equity Index Account R2, CREF Growth Account R2, CREF Global Equities Account R2, CREF Inflation-Linked Bond Account R2, CREF Bond Market Account R2, CREF Money Market Account R2, and CREF Social Choice AccountR2 are variable annuities that invest in underlying securities for a given investment style. The value of the Plan's investment in these variable annuities changes over time based on investment performance and expenses of the accounts.

66.    The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges. For the R2 share class, which was the only share class available to Plan participants during the Class Period, those expenses consisted of the following: (a) distribution expense charge, (b) mortality and expense risk charge, (c) administrative expense charge, and (d) investment management expense charge.

67.    The TIAA Real Estate Account is an insurance company separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges.

68.    The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge

distribution, marketing, and other expenses, depending on the type of investment and share class.

**The Plan's Recordkeeping Fees Were Unreasonable**

### A. The Totality of Circumstances Demonstrate That the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

69.    Defendants, who were fiduciaries of the Plan, breached their duties by failing to: (1) calculate the amount the Plan was paying for recordkeeping through revenue sharing, (2) determine whether the recordkeeper's pricing was competitive, or (3) adequately leverage the Plan's size to reduce fees, among other things. *See Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 332 (3d Cir. 2019) (upholding claims for excessive recordkeeping fees).

70.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).

71.    Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting and monitoring the Plan's recordkeeper, because this information is solely within the possession of Defendants prior to discovery. *See Braden*, 588 F.3d at 598 ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

72.     For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

**B.     ERISA's Fee Disclosure Rule**

73.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans. This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[8]

74.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has stated that having this information permits a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

75.     The 408(b)(2) disclosures in short require a service provider to disclose the services it provides and the fees it collects for such services so that sponsors can determine the reasonableness of the arrangement.

76.     Plan participants, however, do not have access to the disclosures provided to fiduciaries under the 408(b)(2) Regulation. Here, Plaintiff has not had access to any 408(b)(2) disclosures that may have been received by the Plan's fiduciaries.

---

[8] *See* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf     ("DOL     408(b)(2) Regulation Fact Sheet"), last visited April 17, 2023.

77.     Instead, plan administrators have a separate obligation under 29 CFR §
2550.404a-5 to disclose plan-related information, including fees for certain services to
participants. Among other things, fiduciaries are required to provide plan participants "[a]
description of the services to which the charges relate (*e.g.*, plan administration, including
recordkeeping, legal, accounting services)." 29 CFR § 2550.404a-5(C)(2)(ii)(B). These
disclosures are far less detailed than the 408(b)(2) disclosures provided to plan fiduciaries,
like Defendants.

### C.    Costs for Recordkeeping Services Vary Little for Plans with a Substantial Number of Participants

78.     The term "recordkeeping" is a catchall term for the suite of administrative
services typically provided to a defined contribution plan by the plan's "recordkeeper."
Recordkeeping and administrative services fees ("RKA") are one and the same and the
terms are used synonymously.

79.     It is well-established that plan fiduciaries have an obligation to monitor and
control recordkeeping fees in order to ensure that such fees remain reasonable. *See, e.g.*,
*Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k)
plan "breach[] their fiduciary duties" when they "fail[] to monitor and control
recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's]
immediate value" and "depriv[es] the participant of the prospective value of funds that
would have continued to grow if not taken out in fees." *Sweda v. Univ. of Pennsylvania*,
923 F.3d 320, 328 (3d Cir. 2019). No matter the method of payment or fee collection, the
fiduciary must understand the total amount paid the recordkeeper and per-participant fees

22

and determine whether pricing is competitive. *See Tussey*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

80.    There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

- Recordkeeping;

- Transaction processing (which includes the technology to process purchases and sales of participants' assets, as well as providing the participants access to investment options selected by the plan sponsor);

- Administrative services related to converting a plan from one recordkeeper to another;

- Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other materials distributed to participants, *e.g.*, summary plan descriptions);

- Maintenance of an employer stock fund (if needed);

- Plan document services, which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

- Plan consulting services, including assistance in selecting the investment lineup offered to participants;

- Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[9] (excluding the separate fee charged by an independent third-party auditor);

- Compliance support, including assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (excluding separate legal services provided by a third-party law firm); and

- Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

81.     This suite of essential recordkeeping services can be referred to as "Bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. The services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

---

[9]The Form 5500 is the annual report that 401(k) plans are required to file with the DOL and U.S. Department of Treasury pursuant to the reporting requirements of ERISA.

82.     The second type of essential recordkeeping services, hereafter referred to as "*a la carte*" services, are provided by all national recordkeepers, usually as additional fees charged to the accounts of the individual participants who utilize such. These fees are distinct from the bundled fee arrangement described above in order to ensure that only the participant who uses such services is charged for such services. For example, when a participant takes out a plan loan, only the participant taking the loan is charged servicing fees for the loan. These *a la carte* services typically include, but are not limited to, the following:

- Loan processing;

- Brokerage services/account maintenance (if offered by the plan);

- Distribution services; and

- Processing of qualified domestic relations orders or "QDROs".

83.     All national recordkeepers have the capability to provide all the aforementioned recordkeeping services at very little cost to all large defined contribution plans, including those much smaller than the Plan. In fact, several of the services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

84.     The cost of providing recordkeeping services often depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. *See* 1998 DOL Study at 4.2.2 ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size

increases."[10] Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

85.    In general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping. That is because building and maintaining a robust, intuitive, web-based participant interactive 401(k) account system incurs large, fixed costs. Each additional participant placed on the system causes a minimal incremental/marginal cost to the recordkeeper ***notwithstanding the level, number and character of the services provided to that additional participant.***

86.    The incremental costs caused by additional participants may include:

- mailing costs, if materials are delivered by mail versus Internet.

- telephone inquiries through a 1-800 number;

- check distributions from the 401(k) plan to the participant; and/or

- any in-person or online participant education and investment guidance requiring the personnel time of a record keepers staff member. This service is normally charged as an additional line-item cost.

87.    Although the 401(k)-participant servicing can vary slightly in the various service levels, the actual cost to a large recordkeeper with a very robust participant servicing system remains almost constant notwithstanding the level and sophistication of participant servicing the employer has elected for his/her plan. Accordingly, a plan sponsor

---

[10]    *See*    https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf

or fiduciary has the leverage to negotiate favorable rates given that costs of implementation do not change for the service provider.

### D.     Revenue Sharing Arrangements

88.     Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments through a practice known as revenue sharing (or a combination of both or by a plan sponsor). Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

89.     Although utilizing a revenue sharing approach is not per se imprudent, unchecked, it is extremely costly for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, *Revenue Sharing and Invisible Fees*, available at: https://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited April 17, 2023).

90.     As another industry expert noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large

plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

91.     Another problem is that "revenue sharing is not equivalent among all funds; some funds pay no revenue sharing and others pay different revenue-sharing rates. The issue then arises that it may not be fair for some participants to pay a higher expense ratio because revenue sharing is built in. Another concern is that plan participants who invest in more expensive, revenue-sharing funds are bearing a disproportionate amount of the plan's administrative costs compared with their coworkers who have chosen funds without revenue sharing." Jennifer DeLong, *Coming to Grips with Excess Revenue Sharing*, Context, The AllianceBernstein Blog on Investing (June 2014). Thus, prior to the Class Period, AllianceBernstein noted, "the prevalence of revenue sharing is decreasing as more plans rethink their strategies for making plan fees more transparent." *Id.*

92.     As recognized prior to the Class Period, the best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation paid to the recordkeeper will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan. Indeed, in May 2014, AllianceBernstein advised: "DC plans and their fiduciaries may be better served to modify or change the plan design a bit, and it might be wise to consider removing excess revenue sharing from the picture altogether. One route to that solution would be to consider share classes or investment vehicles with lower—or no—

revenue-sharing rates." Daniel Noto, *Rethinking Revenue Sharing*, AllianceBernstein (May 2014).[11]

93.     In this case, using revenue sharing to pay for recordkeeping burdened the Plan's participants with excessive, above-market recordkeeping and administrative fees.

**E.     Defendants Failed to Adequately Monitor the Plan's Recordkeeping Expenses and Compensation Paid to the Recordkeeper**

94.     Defendants did not adhere to fiduciary best practices to control Plan costs and compensation paid to the Plan's recordkeeper.

95.     Numerous courts have upheld claims against fiduciaries of similar university 403(b) plans that a per-participant recordkeeping fee should be no more than $35 annually, including the following:

- Denying NYU's motion to dismiss claim for excessive recordkeeping fees where plaintiffs alleged that "the market rate for administrative fees for plans like those at issue in this case was $35 per participant." *Sacerdote v. New York Univ.*, No. 16-CV-6284 (KBF), 2017 WL 3701482, at *9 (S.D.N.Y. Aug. 25, 2017);

- Denying Brown University's motion to dismiss claim for excessive recordkeeping fees where plaintiffs alleged that the 403(b) "Plans paid significantly too much for recordkeeping compared to market rates,

---

[11]     Available at: https://www.alliancebernstein.com/Research-Publications/CMA-created-content/Institutional/Instrumentation/DC_RethinkingRevenueSharing.pdf (last visited April 17, 2023).

suggesting that $35-$45 annually per participant would be reasonable...."
*See Short v. Brown Univ.*, 320 F. Supp. 3d 363, 371 (D.R.I. 2018);

- Denying Vanderbilt University's motion to dismiss excessive recordkeeping fee claim where plaintiffs alleged that "a reasonable record-keeping fee for the [403(b)] Plan would be a fixed ... $30 per participant." *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1064 (M.D. Tenn. 2018);

- Denying the University of Miami's motion to dismiss excessive recordkeeping fees where plaintiffs alleged "the market rate for such fees are $35 per participant, and here, participants had paid an excess of $100 in fees." *Santiago v. Univ. of Miami*, No. 1:20-CV-21784, 2021 WL 1173164, at *5 (S.D. Fla. Mar. 1, 2021), *report and recommendation adopted*, No. 1:20-CV-21784, 2021 WL 1165441 (S.D. Fla. Mar. 26, 2021);

- Denying Yale University's motion for summary judgment where plaintiffs' evidence showed that "TIAA offered to recordkeep the [403(b)] Plans' fees for $34 per participant." *Vellali v. Yale Univ.*, No. 3:16-CV-1345(AWT), 2022 WL 13684612, at *14 (D. Conn. Oct. 21, 2022);

- California Institute of Technology 403(b) plan "reduced its fees to around $40 per participant during the period from 2011 to 2016 after conducting an RFP in 2010...." *Vellali*, 2022 WL 13684612, at *14;

- Denying USC's motion to strike plaintiffs' expert testimony that "$30 represents a reasonable per-participant recordkeeping fee after identifying several 401(k) plans with per-participant recordkeeping fees below $30,

403(b) plans with recordkeeping fees as low as $33, and recordkeeping bids for Defendants' Plans as low as $21." *Munro v. Univ. of S. California*, No. 2:16-CV-06191-VAP-EX, 2022 WL 16955481, at *8 (C.D. Cal. Nov. 1, 2022);

- Denying 403(b) plan fiduciaries' motion to dismiss excessive recordkeeping fee claims where plaintiffs alleged that plans "with similar participant numbers all paid less than $35 per participant in RK & A fees." *Ruilova v. Yale-New Haven Hosp., Inc.*, No. 3:22-CV-00111-MPS, 2023 WL 2301962, at *4 (D. Conn. Mar. 1, 2023);

- Denying 403(b) plan fiduciaries' motion to dismiss excessive recordkeeping fee claims where plaintiffs alleged "plans much smaller than the Plan—of only 100 participants and $5 million in assets—were paying an average of $35 per participant for "recordkeeping and administration costs in 2017." *In re Sutter Health ERISA Litig.*, No. 1:20-CV-01007-JLT, 2023 WL 1868865, at *10 (E.D. Cal. Feb. 9, 2023) (internal quotes omitted); and

- "Between 2014 and 2016, comparable recordkeeping services for a [403(b)] plan the size of the combined Plans were available for between $35 and $45 per participant." *Morin v. Essentia Health*, No. 16-CV-4397 (RHK/LIB), 2017 WL 4083133, at *3 (D. Minn. Sept. 14, 2017), *report and recommendation adopted*, No. CV 16-4397 (RHK/LIB), 2017 WL 4876281 (D. Minn. Oct. 27, 2017).

96.    As demonstrated in the chart below, the Plan's per participant administrative

and recordkeeping fees were unreasonable when compared to similar 403(b) plans.

| Year | Participants | Direct Comp. to Fidelity | Estimated Indirect Comp. to Fidelity[12] | Estimated Total Comp. | Fees Per Participant | Fees in Excess of $35 Per Participant |
|---|---|---|---|---|---|---|
| 2021 | 12,387 | $1,209,198 | undetermined | $1,209,198.00 | $97.62 | $62.62 |
| 2020 | 11,838 | $398,485 | $781,130 | $1,179,615.84 | $99.65 | $64.65 |
| 2019 | 11,579 | ($181,844) | $1,807,968.39 | $1,626,124.39 | $140.10 | $105.10 |
| 2018 | 10,180 | $377,406 | $1,241,889.48 | $1,619,295.48 | $159.06 | $124.06 |
| 2017 | 11,200 | $98,561 | $1,071,978.60 | $1,170,539.60 | $104.54 | $69.54 |
| Average | | | | | $120.19 | |

97.    Although the Plan's Form 5500s for 2022 and 2023 have yet to be filed with

the DOL, the Participant Disclosure notices published on November 14, 2022 and February

13, 2023, reveals continued excessive fees. Specifically, the Plan discloses a recordkeeping

fee of $54 per participant, and combined recordkeeping and other administrative fees of

$108 per participant per year for all accounts with assets of $10,000 or more. However,

these amounts did not include undisclosed indirect compensation Fidelity received from

revenue sharing payments. Nor did the amounts disclosed in the Participant Fee

Disclosures include compensation Fidelity obtained through BrokerageLink or float

income, among other revenue streams.

98.    For example, the Plan's Form 5500 for 2021 disclose the Plan had

$1,770,114,021 of assets under management. Defendants, however, agreed that anytime

Plan participants deposit or withdraw money from their individual accounts that the money

---

[12] By 2020, the Plan charged an annual fee for recordkeeping and "other administrative fees" in the amount of "$25 plus 5 basis point per year, deducted in equal amounts on a quarterly basis." *See* Required Disclosure Information dated August 10, 2020.

will first pass through a Fidelity clearing account. Defendants also agreed Fidelity could, as part of its compensation for service provided to the Plan, keep all interest or investment returns earned on Plan participant money while the money is in Fidelity's clearing account. This is another form of indirect compensation that Fidelity receives as the recordkeeper for the Plan.

99.     There is nothing *per se* imprudent about this arrangement. The Department of Labor has expressly approved of this type of arrangement but requires fiduciaries (like Defendants) to negotiate, monitor, and factor into a recordkeeper's compensation the earnings that a recordkeeper makes on the float. *See* U.S. Department of Labor Field Assistance     Bulletin     No.     2002-03,     available     at https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/field-assistance-bulletins/2002-03, last visited on April; 17, 2023. Defendants failed to negotiate, monitor, or factor into Fidelity's compensation the earnings that Fidelity receives via float. In fact, Fidelity's earnings on float alone were likely sufficient to cover all of the reasonable administrative expenses for services provided to the Plan.

100.     Indeed, in 2021, roughly $340,000,000 was deposited or withdrawn from the Plan. Fidelity earned float income estimated to be at least $1 million in 2021 alone. Defendants ignored this source of indirect compensation in violation of their ERISA fiduciary duties to the Plan.

101.     Prior to the disclosed $108 recordkeeping and administrative fee arrangement, Defendants reported that Fidelity agreed to a fee of "$25 plus 5 basis point per year, deducted in equal amounts on a quarterly basis." *See* Required Disclosure

Information dated August 10, 2020. However, these amounts did not include undisclosed indirect compensation Fidelity received from revenue sharing payments. Nor did the amounts disclosed in the Participant Fee Disclosures include the compensation Fidelity obtained through BrokerageLink or float income, among other revenue streams.

102.     From the years 2017 through 2023, based upon the information available to Plaintiffs, which was equally or even more easily available to Defendants during the Class Period, it was possible for the Plan to negotiate recordkeeping fees for not more than $35 per participant.

> **F.    Market Surveys and other Sources Provide a Reliable Basis for Participants to Determine Whether the Plan's Recordkeeping Fees Are Unreasonable**

103.     In 2014, NEPC, LLC, a consulting group, reported a significant reduction in median administrative fees to $70 per participant. In 2016, NEPC, LLC reported that for individual account plans with $1 billion in assets, administrative fees had dropped to $37 per participant.

104.     More recently, NEPC conducted its 14th Annual Survey titled the NEPC 2019 Defined Contribution Progress Report (referenced above) which took a survey of various defined contribution plan fees.[13] The sample size and respondents included 121 Defined Contribution Plans broken up as follows: 71% Corporate; 20% Healthcare, and 9% Public, Not-for-Profit and other. The average plan had $1.1 billion in assets and 12,437

---

[13] Available at https://www.nepc.com/insights/2019-dc-plan-and-fee-survey, last visited April 17 2023.

participants. The median plan had $512 million in assets and 5,440 participants. *See* Report at 1.

105.    NEPC's survey found that plans with over 15,000 participants paid on average $40 or less in per participant recordkeeping, trust and custody fees. *See* Report at 10.

106.    The Plan's total recordkeeping costs are clearly unreasonable as numerous authorities have recognized that reasonable rates for large plans typically average around $35 per participant, with costs coming down every year.

107.    For example, in 2020, following extensive review and negotiation, the University of Chicago ERISA fiduciaries reduced annual recordkeeping fees on their two 403(b) plans to $21-$44 per participant. Another example is Fidelity – a recordkeeper for hundreds of plans – which recently stipulated in a lawsuit that a plan with tens of thousands of participants and over a billion dollars in assets could command recordkeeping fees as low as $14-21 per person per year. *See Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 204 (D. Mass. Mar. 27, 2020).

108.    Specifically, Fidelity stipulated as follows:

> The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year; and the value of the recordkeeping services that *Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year*. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity, it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1*

***billion in assets during the Class Period (November 18, 2014 to the present).***

*Moitoso*, No. 1:18-cv-12122-WGY, ECF 138-67, ¶ 2 (emphasis added).

109.    The significance of the Fidelity stipulation is that the Plan's demographics matches favorably with the Fidelity plan's demographics demonstrating the Plan fiduciaries could have negotiated for RKA fees as low as $14 and up to $21 per participant.

110.    In order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

111.    Further, a plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other,

similar plans. *See* Reasonable Contract or Arrangement under Section 408(b)(2)—Fee Disclosure, 75 FR 41600, 41625 ("The Department also assumes that changes in plan disclosures will occur at least once every three years, because plans normally conduct requests for proposal (RFPs) from service providers at least once every three to five years."). *See also* NEPC 2019 Defined Contribution Progress Report, at 10 (the "Best Practice" is to compare fees and services through a record keeping vendor search Request for Proposal process).

112. Numerous courts have refused to dismiss claims asserting that defined benefit plan fiduciaries acted imprudently by failing to conduct an RFP or other competitive bidding process for a plan's recordkeeping fees every three to five years. *See George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011) (the plan's consultant stated that "without an actual fee quote comparison," plaintiffs from another service provider, it could not comment on the reasonableness of fee amounts for the services provided); *Vellali v. Yale Univ.*, No. 3:16-CV-1345(AWT), 2022 WL 13684612, at *9 (D. Conn. Oct. 21, 2022) (denying motion for summary judgment where plaintiffs alleged "defendants breached their fiduciary duty because Yale imprudently failed to obtain competitive bids for recordkeeping services"); *Henderson v. Emory Univ.*, 252 F. Supp. 3d 1344, 1353 (N.D. Ga. 2017) (denying motion to dismiss where plaintiffs alleged "the absence of competitive bidding for the recordkeeping services was imprudent"); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

113. Cerulli Associates stated in early 2012 that more than half of the plan sponsors asked indicated that they "are likely to conduct a search for [a] recordkeeper

within the next two years." These RFPs were conducted even though many of the plan sponsors indicated that "they have no intention of leaving their current recordkeeper."[14]

114.    Generally, any RFPs, if conducted, would not be made available to plan participants. The same is true for Plaintiffs here who do not have direct access to such information.

115.    Additionally, documentation of fiduciary reviews is generally accomplished in the form of meeting minutes. These minutes do not necessarily need to be lengthy, but they should describe the (i) fiduciary topics discussed, (ii) type of investment information considered for the fiduciary review, and (iii) the rationale for resulting investment decisions. Any related documents or data considered for purposes of the investment review (*e.g.*, prospectuses, plan investment reports, market data, etc.) should be included as attachments to the meeting minutes or otherwise memorialized. Without proper documentation of the investment decision-making process, plan fiduciaries are open to the charge that their decisions were made in an imprudent or conflicted manner.

116.    In an attempt to discover the details of the Plan's mismanagement, on November 4, 2022, Plaintiff wrote to the Plan administrator requesting, *inter alia*, meeting minutes from the Committee. By correspondence dated December 9, 2022, the Plan administrator denied this request.

---

[14] "Recordkeeper Search Activity Expected to Increase Within Next Two Years," *Cerulli Assoc.*, January 8, 2013, https://www.plansponsor.com/most-recordkeeping-rfps-to-benchmark-fees, last visited April 17, 2023.

117.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

118.    In short, Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments or monitoring recordkeeping and administration costs, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

119.    For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these fiduciary processes based upon information available to Plaintiff, such as Rule 404a disclosures, Form 5500s filed with the DOL, market surveys, and other authority.

120.    While the Plan has stayed with the same recordkeeper over the course of the Class Period and paid the same relative amount in recordkeeping fees, there is nothing to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time from 2016 through the present – to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with numerous vendors equally capable of providing a high-level service.

### 2020 TOP TEN RECORDKEEPING PROVIDERS

| RANK | COMPANY | ASSETS ($MM) |
|------|---------|--------------|
| 1 | Fidelity Investments | $2,037,733 |
| 2 | Empower Retirement | $493,577 |
| 3 | The Vanguard Group | $454,223 |
| 4 | Alight Solutions | $434,737 |
| 5 | Principal Financial Group | $322,976 |
| 6 | Voya Financial | $211,389 |
| 7 | T. Rowe Price | $195,224 |
| 8 | Prudential Financial, Inc. | $180,544 |
| 9 | Bank of America Corporation | $173,412 |
| 10 | Charles Schwab | $162,876 |

121.    At any point in the Class Period, the Plan's fiduciaries could have opted to conduct an RFP including any of the above recordkeepers, which are peers of Fidelity and capable of providing lower recordkeeping fees.

122.    The recordkeepers in the top ten are all capable of providing the same quality of service and they must do so to succeed in the very highly competitive 401(k)/403(b) service provider arena.

123.     Given the size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost. Moreover, at any point in the Class Period, Defendants could have conducted an RFP to obtain comparable recordkeeping services for lower fees.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duty of Prudence
### (Asserted Against the Committee)

124.     Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

125.     At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

126.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

127.     The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding

41

the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments.

128.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had the Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

129.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for the Prudence Defendants' breaches, as set forth in the Prayer for Relief.

130.    The Prudence Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted Against UVMC and the Board)

131.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

132.    The Board Defendants and UVMC (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

133.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

134.    The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

135.    The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)    Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

(b)    failing to monitor the processes by which the Plan's investments were evaluated; and

(c)    failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

136.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

137.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiff as the Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F.     Actual losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common

fund doctrine; and

L.    Such other and further relief as the Court deems equitable and just.

Date: May **10**, 2023

Russell Barr, Esq.
**BARR LAW GROUP**
125 Mountain Road
Stowe, Vermont 05672
Tel: (802) 253-6272
Fax: (802) 253-6055
Email: russ@barrlaw.com

**EDELSON LECHTZIN LLP**
Eric Lechtzin, Esq.
Marc H. Edelson, Esq.
411 S. State Street, Suite N-300
Newtown, PA 18940
Telephone: (215) 867-2399
elechtzin@edelson-law.com
medelson@edelson-law.com

**MCKAY LAW, LLC**
Michael C. McKay, Esq.
5635 N. Scottsdale Road, Suite 117
Scottsdale, AZ 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us

*Counsel for Plaintiff and the Putative Class*