U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2024 JAN 30  PM 1: 20**

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

TYLER BAKER, individually and on behalf )
of The University of Vermont Medical )
Center 403(b) Plan, )
)
     Plaintiff, )
)
v. )    Case No. 2:23-cv-87
)
THE UNIVERSITY OF VERMONT )
MEDICAL CENTER, INC., the BOARD OF )
TRUSTEES OF THE UNIVERSITY OF )
VERMONT MEDICAL CENTER, the DC )
FIDUCIARY INVESTMENT )
COMMITTEE, and JOHN DOES 1–45, )
)
     Defendants. )

**ORDER ON MOTION TO DISMISS AND ON MOTION TO STAY DISCOVERY**
**(Docs. 14, 36)**

Plaintiff Tyler Baker brings this putative class action against the fiduciaries of The

University of Vermont Medical Center 403(b) Plan (the "Plan") under the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., claiming that the defendants

breached their fiduciary duties "by failing to adequately monitor and control the Plan's

recordkeeping costs." (Doc. 1 ¶ 10.) Defendants have filed a motion to dismiss, arguing under

Fed. R. Civ. P. 12(b)(6) that the complaint does not allege a plausible breach of fiduciary duty.

Defendants further argue under Fed. R. Civ. P. 12(b)(1) that Mr. Baker lacks standing for any

claims involving investment options in which he did not invest, and that he also lacks standing to

seek prospective injunctive relief because he is no longer a Plan participant. (Doc. 14.) Plaintiff

opposes the motion (Doc. 29), and Defendants have filed a reply (Doc. 33). The court has also

considered the amicus brief filed by the Chamber of Commerce of the United States of America

(Doc. 21-1).  The court heard argument on the motion on January 19, 2024 (*see* Doc. 45 (transcript)) and took the motion under advisement on that date.

### Facts

The following facts are drawn from the allegations in the complaint and from materials that are properly subject to judicial notice.  Some additional factual allegations are set forth in the analysis below.

Plaintiff Tyler Baker is a resident of Underhill, Vermont who enrolled in the "Plan" before September 30, 2016.  (Doc. 1 ¶ 16.)  The Plan is a tax-deferred savings plan under 26 U.S.C. § 403(b) funded by employer and employee contributions.  (*See id.* ¶ 42.)  Defined contribution plans like the Plan—and the more familiar "401(k)" plans—allow participants to maintain tax-advantaged individual investment accounts, "the value of which 'is determined by the market performance of employee and employer contributions, less expenses.'"  *Cunningham v. Cornell Univ.*, 86 F.4th 961, 969 (2d Cir. 2023) (quoting *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015)).  "The administrators of defined-contribution plans are responsible for choosing a menu of investment options, and plan participants then choose their investments from that menu."  *Id.*

According to the complaint, the "menu" in this case included: (1) a "default" investment option, consisting of a suite of T. Rowe Price Retirement Target Date Funds; (2) a set of 17 investment choices managed by Fidelity; and (3) self-directed brokerage accounts provided by Fidelity Brokerage Services, LLC through Fidelity's "BrokerageLink" service.  (Doc. 1

¶¶ 53–55.)  The Plan also retained "numerous legacy investment options,"[1] including ten investment choices managed by TIAA-CREF.  (*Id.* ¶¶ 58, 62.)

The University of Vermont Medical Center, Inc. ("UVMMC") is the Plan sponsor, the named administrator of the Plan, and a named Plan fiduciary.  (*Id.* ¶¶ 19, 45.)  Acting through its board of directors,[2] UVMMC appointed the DC Fiduciary Investment Committee (the "Committee")[3] as a Plan fiduciary.  (*Id.* ¶¶ 20, 24.)  Fidelity Workplace Services LLC ("FWS") is the Plan's recordkeeper and third-party administrator.[4]  (*Id.* ¶ 46.)

The Plan "has discretion to charge each Plan participant for expenses of plan administration, including recordkeeping."  (*Id.* ¶ 50.)  As the Second Circuit summarized in a recent decision:

> In any defined-contribution plan, participants incur certain fees and expenses. . . . Investment management fees are charged by the investment providers and are associated with the services of buying, selling, and managing investments. Investment fees are typically expressed as an "expense ratio," that is, a percentage

---

[1] The complaint defines a "legacy" investment as one "held with a terminated provider or in a legacy investment with an approved provider."  (*Id.* ¶ 59.)

[2] The complaint lists John Does 1–25 as the members of the UVMMC board during the Class Period.  (*Id.* ¶ 25.)

[3] The complaint lists John Does 26–35 as members of the Committee.  (*Id.* ¶ 32.)  John Does 36–45 are "additional committees, officers, employees and/or contractors of UVMC who are/were fiduciaries of the Plan during the Class Period" or who were hired "as an investment manager for the Plan during the Class Period."  (*Id.* ¶ 34.)

[4] Fidelity Workplace Services LLC is a Delaware limited liability company.  *See* Division of Corporations, https://icis.corp.delaware.gov/eCorp/EntitySearch/NameSearch.aspx (search by file number 4878355) (last visited Jan. 23, 2024).  It is registered as a foreign LLC in the Commonwealth of Massachusetts.  *See* Business Entity Summary, https://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSearch.aspx (search by identification number 001157411) (last visited Jan. 23, 2024) [https://perma.cc/SU8K-TPH7].  The publicly filed annual reports indicate that FWS was a holding company at all relevant times.  The court can properly take judicial notice of these public records.  *See Melendez v. City of New York*, 16 F.4th 992, 996 (2d Cir. 2021) (considering documents incorporated into complaint by reference and "all matters of proper judicial notice and public record").

of the assets under management.  For mutual funds, some providers offer different share classes of the same fund: a "retail" share class available to all investors at one expense ratio and "institutional" share classes with lower expense ratios available only to investors that satisfy certain minimum investment amounts—typically institutional investors.

Recordkeeping fees cover necessary administrative expenses such as tracking account balances and providing regular account statements. Recordkeeping fees are charged either as a flat fee, with each fund participant paying a set amount, or by "revenue sharing," in which the fund pays the recordkeeper a set portion of the fund's expense ratio.  Recordkeeping services may be provided by the investment providers themselves or by third parties.

*Cunningham*, 86 F.4th at 969–70.  According to the complaint, Defendants disclose "very little information to participants concerning the payment of costs, expenses, and fees incurred in administering the Plan."  (*Id.* ¶ 48.)

The complaint cites multiple cases for the proposition that "[n]umerous courts have upheld claims against fiduciaries of similar university 403(b) plans that a per-participant recordkeeping fee should be no more than $35 annually."  (*Id.* ¶ 95.)  Drawing on data from the publicly available Form 5500s for 2017–2021,[5] Plaintiff alleges that the Plan's administrative and recordkeeping fees were greater than $35 per participant in each of those years.  (*See* Doc. 1 ¶ 96.)  Plaintiff calculates the fees per participant as the sum of "direct" and "indirect" compensation paid to Fidelity Investments Institutional Operations Company[6] in each calendar

---

[5] The court considers the Form 5500s at this stage of the case because those returns are public documents that are referenced in the complaint.  *See Melendez v. City of New York*, 16 F.4th 992, 996 (2d Cir. 2021) (considering documents incorporated into complaint by reference and "all matters of proper judicial notice and public record")

[6] "FID INV INST OPS CO" is listed as the relevant payee in each of the Form 5500 reports.  Fidelity Investments Institutional Operations Company ("FIIOC") was a domestic corporation in the Commonwealth of Massachusetts at all relevant times until 2020, when it was converted into a limited liability company with the same name.  *See* Business Entity Summary, https://corp.sec.state.ma.us/CorpWeb/CorpSearch/CorpSearch.aspx (search by identification number 042647786) (last visited Jan. 23, 2024) [https://perma.cc/THN8-7HHG].  Publicly available corporate documents indicate that FIIOC is a wholly owned subsidiary of FWS. Fidelity Auditor's Guide at 73 (2022), https://plansponsorservices.fidelity.com/bin-

year, divided by the number of participants each year.  (*See id.*)  The following chart summarizes

some of the key figures for each relevant year:

| Year | Number of Participants at End of Plan Year[7] | Plan Net Assets at End of Plan Year[8] | Direct Compensation Paid to Fidelity[9] | "Estimated" Indirect Compensation Paid to Fidelity per Complaint ¶ 96 |
|---|---|---|---|---|
| 2017 | 11,200 | $1,171,842,366 | $98,561 | $1,071,978.60 |
| 2018 | 10,180 | $1,131,612,050 | $377,406 | $1,241,889.48 |
| 2019 | 11,579 | $1,349,761,970 | ($181,844) | $1,807,968.39 |
| 2020 | 11,838 | $1,562,271,287 | $398,485 | $781,130.00 |
| 2021 | 12,387 | $1,769,890,131 | $1,209,198 | "undetermined" |

Based on these figures, Plaintiff asserts that the Plan paid more than $35 in fees per participant in

each of the relevant years.  (Doc. 1 ¶ 96.)

According to the complaint, the "indirect" compensation that Fidelity received—listed in

the right-most column in the chart above—consisted of (at least) the following categories:

- Fees for recordkeeping paid through revenue sharing (*see id.* ¶¶ 69, 88, 93, 101);

- "Float" (*id.* ¶¶ 98–100); and

---

public/06_PSW_Website/documents/Auditor's%20Guide.pdf ("FIIOC is wholly owned by
FWS . . . .") [https://perma.cc/WW48-SF87].  The court can properly take judicial notice of these
public records, *see Melendez*, 16 F.4th at 996 (considering "all matters of proper judicial notice
and public record"), and of the data on Fidelity's website, *see Picket Fence Preview, Inc. v.
Zillow, Inc.*, 623 F. Supp. 3d 371, 380 (D. Vt. 2022).  For present purposes—consistent with ¶ 96
of the complaint—the court refers to both FIIOC and FWC as "Fidelity."

[7] These figures appear on the chart in ¶ 96 of the complaint and are consistent with the
Form 5500 entries for each relevant year: Doc. 14-2 at 3; Doc. 14-6 at 3; Doc. 14-7 at 3;
Doc. 14-8 at 3; Doc. 14-3 at 3.

[8] These figures appear on Schedule H ("Financial Information") of the Form 5500s for
the relevant years: Doc. 14-2 at 94; Doc. 14-6 at 98; Doc. 14-7 at 102; Doc. 14-8 at 52; and
Doc. 14-3 at 52.  The figures for 2017 and 2021 also appear in ¶ 8 of the complaint.

[9] These figures appear on the chart in ¶ 96 of the complaint and are consistent with the
Form 5500 Schedule C ("Service Provider Information") entries for each relevant year: Doc. 14-
2 at 43; Doc. 14-6 at 43; Doc. 14-7 at 43; Doc. 14-8 at 43; Doc. 14-3 at 43.

- Compensation to Fidelity Brokerage Services, LLC for the BrokerageLink service (*id.* ¶¶ 55–56).

Unlike the direct compensation that is reported on the Form 5500s, the sums that Fidelity received for these categories of indirect compensation are not reported on the Form 5500 disclosures.[10] The court infers that, for that reason, ¶ 96 lists only "estimated" total indirect compensation. The complaint includes the following allegations relevant to each of the three categories of indirect compensation.

A.    **Recordkeeping Fees**

The complaint alleges that Fidelity's "indirect" compensation for its recordkeeping services was derived (at least in part) from "revenue sharing." (*See* Doc. 1 ¶¶ 88, 93, 97.) As noted above, in a revenue-sharing arrangement, "the fund pays the recordkeeper a set portion of the fund's expense ratio." *Cunningham*, 86 F.4th at 970; *see also Albert v. Oshkosh Corp.*, 47 F.4th 570, 580 (7th Cir. 2022) (noting that in revenue-sharing arrangements "some of the money raised via expense ratios for investment-management fees is shared with the recordkeeper"). Because the expense ratio depends on assets under management, *Cunningham*,

---

[10] The instructions for the Form 5500s recognize that providers like Fidelity receive "indirect" compensation, but the instructions divide "indirect" compensation into two categories: "eligible" indirect compensation and all other indirect compensation. Instructions for Form 5500 (2023), https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2021-instructions.pdf (last visited Jan. 24, 2024) [https://perma.cc/LZX2-7MYV]. Each of the three categories of indirect compensation described in the complaint appear to be "eligible" indirect compensation. *See id.* (defining "eligible" indirect compensation as: "[F]ees or expense reimbursement payments charged to investment funds and reflected in the value of the investment or return on investment of the participating plan or its participants, finder's fees, 'soft dollar' revenue, float revenue, and/or brokerage commissions or other transaction-based fees for transactions or services involving the plan that were not paid directly by the plan or plan sponsor (whether or not they are capitalized as investment costs)."). The Form 5500s do not require disclosure of the dollar amounts of "eligible" indirect compensation.

86 F.4th at 969, the chart above includes the Plan's end-of-year net assets. The court infers that Fidelity received indirect compensation in each relevant year, at least a portion of which constituted revenue sharing that varied annually as a function of the Plan's assets under management.

## B. Float

The complaint alleges that the Plan was structured such that "any time Plan participants deposit or withdraw money from their individual accounts," the money passed first "through a Fidelity clearing account." (Doc. 1 ¶ 98.) Plaintiff alleges that Defendants agreed that "Fidelity could, as part of its compensation for service provided to the Plan, keep all interest or investment returns earned on Plan participant money while the money is in Fidelity's clearing account." (*Id.*) Plaintiff concedes that "[t]here is nothing *per se* imprudent about this arrangement." (*Id.* ¶ 99.) But Plaintiff asserts that "Defendants failed to negotiate, monitor, or factor into Fidelity's compensation the earnings that Fidelity receives via float." (*Id.*) Plaintiff notes that approximately $340 million was deposited or withdrawn from the Plan in 2021, which Plaintiff estimates would have resulted in at least $1 million in "float" income for Fidelity. (*Id.* ¶ 100.)

## C. BrokerageLink

The relevant factual allegations regarding BrokerageLink are as follows:

Defendants chose Fidelity Brokerage Services, LLC to provide self-directed brokerage accounts to Plan participants through Fidelity's trademarked BrokerageLink® service. As of December 31, 2017, more than $47 million in Plan assets was invested in self-directed funds through BrokerageLink and an additional $4.2 million was held in Fidelity BrokerageLink's Money Market Fund. By December 31, 2021, more than $66 million in Plan assets was invested in self-directed funds through BrokerageLink and an additional $4 million was held in Fidelity BrokerageLink's Money Market Fund.

Fidelity has received and continues to receive substantial additional compensation from BrokerageLink, but Defendants have failed to require that the Plan receive a credit for that compensation as an offset to Fidelity's recordkeeping fees.

7

Defendants acted imprudently by failing to account for all the direct and indirect compensation Fidelity received through BrokerageLink.

Defendants imprudently failed to design or implement a process to evaluate or control the administrative expenses that the Plan's participants paid to Fidelity, and imprudently failed to analyze and evaluate compensation paid to Fidelity from investments through BrokerageLink.

(Doc. 1 ¶ 55–57.)

Ultimately, Plaintiff concedes that he does not have "actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting and monitoring the Plan's recordkeeper." (Doc. 1 ¶ 71.) However, Plaintiff asserts that Defendants breached their duties "by failing to: (1) calculate the amount the Plan was paying for recordkeeping through revenue sharing, (2) determine whether the recordkeeper's pricing was competitive, or (3) adequately leverage the Plan's size to reduce fees, among other things." (*Id.* ¶ 69.)

Throughout his participation in the Plan, Mr. Baker paid "recordkeeping and administrative costs associated with the Plan." (*Id.* ¶ 16.) He invested in certain options that the Plan offered, including "various collections of mutual funds and variable annuities offered by entities such as TIAA-CREF, T. Rowe Price, Fidelity and Vanguard and guaranteed investment accounts offered by entities including Sun America." (*Id.*) Plaintiff also alleges that retaining the "legacy investment options"—as opposed to "mapping" them to "less expensive comparable investment options—"added to the Plan's overall administrative expenses . . . without adding anything of value for Plan participants." (*Id.* ¶¶ 58, 61.)

## Legal Standards

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Cunningham*, 86 F.4th at 972 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).  The parties agree that the "plausibility" standard applies in this ERISA case. (*See* Doc. 14-13 at 13; Doc. 29 at 13; Doc. 33 at 7.)[11]  As discussed below, however, the parties disagree about the contours of that standard in this context.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the court lacks the statutory or constitutional power to adjudicate the case." *Nowak v. Ironworkers Loc. 6 Pension Fund*, 81 F.3d 1182, 1187 (2d Cir. 1996).  A court lacks constitutional power to adjudicate a case in situations "such as when 'the plaintiff lacks constitutional standing to bring the action.'" *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021) (quoting *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 416–17 (2d Cir. 2015)).  Plaintiff has the burden to show the elements of Article III standing: (1) "an imminent injury in fact"; (2) the injury is "fairly traceable to [the challenged act]"; and (3) "a favorable decision would redress [his] injuries." *Id.* at 172–73 (first alteration in original) (quoting *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017)).

## Analysis

### I.   Standing

The court begins with the questions of standing that Defendants raise in the portion of their motion brought under Rule 12(b)(1). *See Chevron Corp. v. Naranjo*, 667 F.3d 232, 246 n.17 (2d Cir. 2012) (courts ordinarily address challenges to personal jurisdiction "prior to deciding the merits of the cause of action").  Defendants seek partial dismissal under

---

[11] The Chamber of Commerce also agrees on this point.  (Doc. 21-1 at 10.)

Rule 12(b)(1) on two grounds.  First, they argue that Plaintiff lacks standing "for any claims involving investment options that he did not invest in." (Doc. 14-1 at 30.)  Second, Defendants maintain that Plaintiff lacks standing "to seek prospective injunctive relief as he is no longer a participant in the Plan." (*Id.* at 31.)  The court considers those arguments in turn.

### A.   Claims Involving Investment Options in Which Mr. Baker Did Not Invest

Defendants argue that Plaintiff's claim involving BrokerageLink and the so-called "legacy investment options" should be dismissed for lack of subject-matter jurisdiction because "Plaintiff never invested in these investment options or used the BrokerageLink." (Doc. 14-1 at 9.)  Plaintiff does not assert that he invested in the "legacy" investment options or used BrokerageLink.  Instead, Plaintiff maintains that: (1) the complaint does not include any claim "pertaining to imprudent investments on the Plan menu" and that Defendants are therefore seeking dismissal of "a claim that does not exist"; and (2) Plaintiff has standing "to seek remedies on behalf of the plan as a whole, not merely on behalf of plan participants invested in particular funds through the plan in which [Plaintiff] invested." (Doc. 29 at 31.)

For their position, Defendants rely on *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259 (S.D.N.Y. 2023).  The plaintiffs in that ERISA case alleged that their former employer breached its fiduciary duty of prudence because, according to the plaintiffs, the employer's defined-contribution retirement plans had recordkeeping costs that were higher than comparable peer plans. *Id.* at 262–63.  In addition to their claims about recordkeeping costs, the plaintiffs also alleged that six funds offered by the retirement plans had excessive management costs. *Id.* at 263.  The district court held that the plaintiffs lacked standing "with respect to four of the six challenged funds" because "the plaintiffs only invested in two of those six challenged funds." *Id.* at 265.  The court reasoned:

> A defined-contribution plan is a retirement plan in which a plan participant's benefit is determined entirely by that participant's individual contributions to their own plan and in which the participants direct the investment of their contributions into various investment options offered by the plan. It follows, then, that a plan participant who does not invest their plan assets into a particular fund offered in a defined-contribution plan will not have their individual plan benefit affected in any way by that fund's performance or associated fees.

*Id.*

In their reply memorandum, Defendants fault Plaintiff for failing to analyze or cite *Singh*. (Doc. 33 at 16.) The court finds *Singh* unpersuasive, however, because the *Singh* court reasoned only that a participant who did not invest in a fund offered in a defined-contribution plan would not have their benefit affected by "*that fund's* performance or associated fees." *Singh*, 650 F. Supp. 3d at 265 (emphasis added). That rationale does not address costs associated with the Plan as a whole.

The court finds *Bilello v. Estée Lauder, Inc.* to be more persuasive on this issue. The plaintiffs in that ERISA case claimed that the fiduciaries of Estée Lauder, Inc.'s defined-contribution retirement plan breached their duties by:

> (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (2) maintain certain funds in the Plan despite the availability of identical or materially similar investment options with lower costs and/or better performance histories; and (3) failing to monitor and control the Plan's recordkeeping expenses.

Am. Compl. ¶ 10, *Bilello v. Estée Lauder, Inc.*, No. 20-CV-4770 (Sept. 22, 2020), ECF No. 13. At a hearing on July 8, 2021, the court articulated its reasons for denying the defense argument "that plaintiffs lack standing to the extent that they did not invest in particular funds within the plan." Transcript at 3, *Bilello v. Estée Lauder, Inc.*, No. 20-CV-4770 (July 8, 2021), ECF No. 74. The court reasoned that the plaintiffs' challenge was to "the process that the defendants had used to manage the plan as a whole" and that the plaintiffs therefore had standing "to challenge the plan in its entirety, notwithstanding the fact that they did not invest in all funds

within the plan." *Id.* at 3–4.  In a written order dated July 26, 2021, the *Bilello* court denied a defense motion for reconsideration, affirming that "Plaintiffs, having alleged an injury-in-fact, may bring claims for mismanagement of the plan as a whole."  *Bilello*, 2021 U.S. Dist. LEXIS 138793, at *1.

Here, similar to *Bilello*, Plaintiff alleges an injury-in-fact related to management of the Plan as a whole, and Plaintiff's breach-of-fiduciary-duty and failure-to-monitor claims challenge the process that Defendants used to manage the Plan as a whole.  The court concludes that Plaintiff has standing to bring those challenges even if he did not invest in all funds within the Plan.

### B.    Prospective Injunctive Relief

The class action allegations in the complaint assert that "injunctive, declaratory, or other appropriate equitable relief" is appropriate "with respect to the Class as a whole."  (Doc. 1 ¶ 41.) Defendants argue that Plaintiff lacks standing "to seek prospective injunctive relief as he is no longer a participant in the Plan."  (Doc. 14-1 at 31.)  In support, Defendants rely on *Calcano v. Swarovski North America Ltd.*, in which the Second Circuit stated that "[a] plaintiff pursuing injunctive relief may not rely solely on past injury, but also must establish that 'she is likely to be harmed again in the future in a similar way.'"  36 F.4th 68, 74 (2d Cir. 2022) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016)).  Plaintiff's opposition brief does not address that argument.  The court therefore concludes that Plaintiff has conceded this issue. *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (plaintiff opposing motion to dismiss conceded issue through silence).

## II.     Plausibility of Plaintiff's ERISA Claims

### A.     The Rule 12(b)(6) Standard as Applied in this ERISA Case

As noted above, the parties agree that the "plausibility" standard applies in this ERISA case, but they disagree about the contours of that standard in this context.  The court therefore begins its analysis with a brief review of the statutory origin of the fiduciary duty at issue.  Although the fiduciary duty has its origins in trust law, it is specifically defined for purposes of ERISA at 29 U.S.C. § 1104.

The fiduciary is required to discharge its duties "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A).  Congress was explicit in requiring the fiduciary to pay only "reasonable expenses."  The statute proceeds to define the "prudent man standard of care" imposed on the fiduciary.  The fiduciary is required to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  *Id.* § 1101(a)(1)(B).

There is nothing surprising about these federal standards.  Section 77 of the Restatement (Third) of Trusts proposes the same standard for decisional law:

(1)  The trustee has a duty to administer the trust as a prudent person would, in light of the purposes, terms, and other circumstances of the trust.

(2)  The duty of prudence requires the exercise of reasonable care, skill, and caution. Expenses incurred by a trustee must be "reasonable in amount and appropriate to the purposes and circumstances of the trust."  Restatement (Third) of Trusts § 88.

Section 1109 of Title 29 authorizes lawsuits for breach of the "responsibilities, obligations, or duties imposed upon fiduciaries." 29 U.S.C. § 1109(a). A fiduciary is personally liable "to make good to such plan any losses to the plan resulting from each such breach." *Id.* In enacting the ERISA provisions, Congress anticipated a robust enforcement of the prudent man standard, including its application to plan expenses. In *Tibble v. Edison International*, 575 U.S. 523 (2015), the Supreme Court held that this standard applies to the actions of the fiduciary over the entire course of the relationship.

What has resulted is a flood of lawsuits against plans set up by private industry and non-profit organizations such as UVMMC. *See, e.g.*, Dylan A. White, Note, *To Proceed or Dismiss: Article III Standing in ERISA Fiduciary Investment Claims Litigation Involving Defined-Contribution Plans*, 31 Elder L. J. 159, 166 (2023) (noting proliferation of claims alleging excessive fees as the basis for breach of ERISA's fiduciary duty of prudence); Ronald E. Hagan, *Retirement Plan Fees Worsen Enterprise Risk*, 37 No. 5 J. of Comp. & Benefits, art. 3 (2021) (discussing "stunning growth in lawsuits" for alleged ERISA violations in connection with employer-sponsored defined-contribution plans); Natalya Shnitser, *The New Fiduciaries*, 88 U. Cin. L. Rev. 685, 689 & n.12 (2019) (noting host of lawsuits for breach of fiduciary duties premised on failure to properly monitor recordkeeping fees). As here, Defendants have sought to push back against unwelcome scrutiny of the details of their retirement plans by insisting on "benchmarks" from which a court could infer imprudence.

The leading case on the pleading standard for suits alleging breach of fiduciary duty is *Hughes v. Northwestern University*, 595 U.S. 170 (2022). Among the claims brought in *Hughes* was a claim that the fiduciary "failed to monitor and control the fees they paid for recordkeeping, resulting in unreasonably high costs to plan participants." 595 U.S. at 174. The Court reversed

14

the Seventh Circuit, which had affirmed the dismissal of the complaint, largely for reasons not relevant here. The lower court decisions relied heavily on the choice afforded plan beneficiaries as a defense to the claim that some versions of the plan were too costly. The Court rejected this position, reasoning that "the participants' ultimate choice over their investments [could not] excuse allegedly imprudent decisions [by a fiduciary.]" *Id.* at 176.

In remanding the case to the Seventh Circuit, the Court directed the Seventh Circuit to apply the standards developed in the *Iqbal* and *Twombly* decisions.

> On remand, the Seventh Circuit should consider whether petitioners have plausibly alleged a violation of the duty of prudence as articulated in *Tibble*, applying the pleading standard discussed in [*Iqbal* and *Twombly*]. Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific.

*Id.* at 177 (cleaned up). On remand, the Seventh Circuit held that the plaintiffs pleaded a plausible ERISA breach-of-fiduciary-duty claim based on the "plausible inference . . . that the university neglected to keep its recordkeeping fees paid through revenue sharing at a reasonable level." *Hughes v. Nw. Univ.*, 63 F.4th 615, 633 (7th Cir. 2023).

What this means in the present case is that the court applies long-standing principles of trust law, fairly summarized as the prudent person standard, through the now-familiar lens of *Twombly* and *Iqbal*. There is nothing surprising or novel in this formulation. The court turns to the particular objections to the complaint raised by the defendants.

## B.    Comparator Plans

Defendants challenge the absence of allegations about the administrative fees paid by other institutions with similar 403(b) plans. Rather than focus on the road not followed by the plaintiff, the court considers the allegations actually put forward. These are:

- The disclosures that are provided to Plan participants fail to state the actual amount of plan administrative fees and expenses that have been or will be incurred by each participant.  (Complaint, Doc. 1 ¶ 50.)

- Information about the defendants' actions in selecting and monitoring the Plan's recordkeeper is known only to the defendants.  (*Id.* ¶¶ 71, 73–76.)

- The duties of a plan administrator are broadly similar from one plan to the next and are generally conducted through the creation of an electronic system permitting individual participants to access their accounts.  Once this system is in place, the addition of new plans and employees does not impose substantial incremental cost.  (*Id.* ¶¶ 80–87.)

- Federal courts have permitted claims for excess administrative costs to proceed beyond a motion to dismiss when the fee per participant exceeded $35 (New York University); $35–$45 (Brown); $30 (Vanderbilt); $35 (University of Miami); $35 (Yale-New Haven Hospital).  (*Id.* ¶ 95.)

- Defendants' per-participant fees ranged between $97 and $159 during the years 2017 and 2021.  (*Id.* ¶ 96.)

- A consulting organization (NEPC, LLC) has published statistics showing a decline in median administrative fees from $70 per participant in 2014 to $40 or less in 2019. (*Id.* ¶¶ 103–104.)

- In 2020, the University of Chicago plan reduced recordkeeping fees to $21–$44 per participant.  (*Id.* ¶ 107.)

Whether these allegations are true lies beyond the scope of a motion to dismiss.  What they illustrate is that Plaintiff has provided a detailed description of his claim, supported by specific examples drawn from other institutions.  Defendants' remaining challenges are, for the

most part, attacks on the allegations listed above.  Again, the court cannot determine the truth of

Plaintiff's allegations at this stage of the case.  The following discussion is sufficient to address

Defendants' remaining arguments.

### C.     "Estimated" Fees

Regarding the allegation that Defendants' per-participant fees ranged between $97 and

$159 during the years 2017 and 2021 (Doc. 1 ¶ 96), Defendants contend that those sums are

based on speculation and "unsupported conjecture."  (Doc. 14-1 at 19–20.)  It is true that the

court has "no obligation to entertain pure speculation and conjecture."  *Gallop v. Cheney*,

642 F.3d 364, 368 (2d Cir. 2011).  But "[a] plaintiff may plead facts alleged upon information

and belief 'where the facts are peculiarly within the possession and control of the defendant . . .

or where the belief is based on factual information that makes the inference of culpability

plausible.'"  *Popovchak v. UnitedHealth Grp.*, No. 22-CV-10756, 2023 WL 6125540, at *11

n.22 (S.D.N.Y. Sept. 19, 2023) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120

(2d Cir. 2010)).  And Plaintiff, like many ERISA claimants, "generally lack[s] the inside

information necessary to make out [his] claims in detail unless and until discovery commences."

*Id.* (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009)).

Here, the court infers that the complaint relies on "estimated" indirect compensation

because Plaintiff does not have access to data that would allow him to precisely calculate the

actual indirect compensation.  Notably, however, the allegations for 2021 indicate that direct

compensation was $1,209,198 and that, even without any contribution from "indirect"

compensation, the fees per participant were $97.62.  (Doc. 1 ¶ 96.)  The complaint also alleges

that indirect compensation in 2021 included estimated float income of at least $1 million.  (*Id.*

¶ 100.)[12]  Thus—even if Fidelity received no indirect compensation from revenue sharing or from BrokerageLink—the plausible estimated total compensation in 2021 was at least $2,209,198, which would result in $178.35 in fees per participant.  Combined with the allegations of revenue sharing, the court concludes that the complaint plausibly alleges fees per participant that exceed $35 in each of the relevant years.

### D.    The Alleged "Market Rate" for Fees

Defendants attack the $35 figure, arguing that "[i]t is unclear whether the alleged $35 is only for recordkeeping fees or includes the total compensation paid to the recordkeeper." (Doc. 14-1 at 21.)  It appears from the complaint that Plaintiff alleges that $35 is the per-participant "market rate" for (only) the recordkeeping fee for similar plans.  (Doc. 1 ¶ 95.)  The court takes Defendants' point that the per-participant "market rate" for total compensation would therefore be greater than $35—it would include, for example, float income and brokerage commissions.  At the same time, the complaint includes an allegation that the recordkeeping fee per participant was $54 in 2023.  (Doc. 1 ¶ 97.)  Although not normalized for inflation, this apples-to-apples comparison plausibly indicates an excessive recordkeeping fee.

Defendants also attack the $35 figure (implicitly) by arguing that the cases cited at ¶ 95 of the complaint do not involve similarly situated comparators.  (*See* Doc. 14-1 at 16.) According to Defendants, the summaries of those cases in the complaint "fail to indicate the size of the plans, the number of participants, the years involved, the plans' recordkeepers, or services provided by any of the plans' recordkeepers."  (*Id.*)  The court agrees that it is not required to blindly accept Plaintiff's assertion that the plans in those other cases were "similar" to the Plan in

---

[12] The court finds that "estimate" to be plausibly based on the allegation that "roughly $340,000,000 was deposited or withdrawn from the Plan" in 2021.  (*Id.* ¶ 100.)

this case.  (Doc. 1 ¶ 95.)  But the court accepts at this stage that the plans at issue in those cases involving major universities were of sufficiently similar size.  Regarding services provided, the complaint expressly alleges that "[i]n general, the level, number and character of participant services provided by the recordkeeper have minimal impact upon the costs of providing recordkeeping."  (*Id.* ¶ 85.)  Again, the court need not determine here whether that allegation is true, but for present purposes the court concludes that it supports the inference that the cases cited at ¶ 95 of the complaint involve sufficiently similar comparators.

In a further attack on the $35 figure, Defendants challenge the probity of the allegations in the complaint that a 2016 NEPC, LLC ("NEPC") survey indicated that "for individual account plans with $1 billion in assets, administrative fees had dropped to $37 per participant" and that a 2019 NEPC survey indicated that "plans with over 15,000 participants paid on average $40 or less in per participant recordkeeping, trust and custody fees."  (Doc. 1 ¶¶ 103–105.)  Defendants argue that courts routinely find that NEPC surveys cannot support claims for excessive recordkeeping fees because of "qualifying language" in the results and because of a lack of specificity.  (Doc. 14-1 at 25 (citing cases).)  At the January 19, 2024 hearing, counsel for Plaintiff cited cases that he asserts reached the opposite conclusion.  (*See* Doc. 45 at 40–41.)  The court concludes that the allegations regarding the NEPC survey results add some support to Plaintiff's allegations.  In any case, even without the alleged NEPC survey results, Plaintiff's allegations are sufficient for the reasons discussed above.

### E.    BrokerageLink

Defendants argue that no inference of imprudence can be drawn from the allegations in the complaint regarding BrokerageLink.  (Doc. 14-1 at 24.)  According to Defendants, the allegations do not support "any conclusion other than Fidelity received only reasonable,

necessary fees for the BrokerageLink services provided to Plan participants." (*Id.*)  Plaintiff does

not dispute that the complaint lacks allegations specifying the compensation that Fidelity

received for the BrokerageLink services.  Instead, Plaintiff asserts that even *Defendants* do not

know what that compensation was "because Defendants have failed to negotiate, evaluate,

monitor, or control this source of compensation." (Doc. 29 at 21.)  In support, Plaintiff relies on

*Bugielski v. AT&T Services, Inc.*, 76 F.4th 894 (9th Cir. 2023).  Defendants argue that *Bugielski*

is distinguishable.  (Doc. 33 at 13 n.6.)

As the *Bugielski* court recognized, a fiduciary cannot satisfy its duty of prudence if the

fiduciary "is unaware of how and to what extent a service provider is compensated." *Bugielski*,

76 F.4th at 912.  In light of Plaintiff's relative lack of information regarding Defendants' conduct

at this stage of the case, the court accepts as true (for present purposes) the allegation that

Defendants failed to evaluate or monitor the compensation for BrokerageLink.

**F.     "Legacy" Investment Options**

As noted above, Plaintiff alleges that retaining the "legacy investment options"—as

opposed to "mapping" them to "less expensive comparable investment options—"added to the

Plan's overall administrative expenses . . . without adding anything of value for Plan

participants." (*Id.* ¶¶ 58, 61.)  Defendants argue that the complaint "fails to allege what any

comparable investment options are or their expense ratios, cost, or fee layers (or lack thereof)

and fails to allege what any of the costs of expenses are for the legacy investments and their

alleged fee layers." (Doc. 14-1 at 28.)  Plaintiff maintains that retaining the "legacy" investment

options "wasted millions of Plan assets" and is "[a]nother indication of Defendants' fiduciary

breaches." (Doc. 29 at 23–25.)

The complaint alleges that Defendants could have "mapped" the legacy investment options to less expensive comparable options. The court need not decide the truth of that allegation here. The court is also mindful of the Eighth Circuit's statement in *Meiners v. Wells Fargo & Co.* that "the existence of a cheaper fund does not mean that a particular fund is too expensive *in the market generally* or that it is otherwise an imprudent choice." 898 F.3d 820, 823–24 (8th Cir. 2018). For present purposes, the court accepts Plaintiff's allegations about "legacy" investments as true and concludes that they support the constellation of alleged breaches of the duty of prudence.

G.      **Failure-to-Monitor Claim**

In addition to the first claim for relief against the DC Fiduciary Investment Committee based on alleged breaches of the fiduciary duty of prudence, the complaint includes a second count against UVMMC and its board for alleged failure to adequately monitor other fiduciaries. (Doc. 1 ¶¶ 131–137.) Defendants argue that this duty-to-monitor claim cannot survive without an underlying breach of fiduciary duty. (Doc. 14-1 at 32.) For the reasons discussed above, however, the court concludes that Plaintiff has alleged a plausible prudence claim. The court will not dismiss the failure-to-monitor claim as derivative.

Finally, Defendants assert that the duty-to-monitor claim is conclusory because, in Defendants' view, the complaint lacks allegations "supporting a claim for imprudent appointing, overseeing, and removing Committee members." (Doc. 14-1 at 32.) But the complaint alleges that UVMMC and its board:

- "Fail[ed] to monitor and evaluate the performance of the Committee or have a system in place for doing so";

21

- "[F]ail[ed] to monitor the processes by which the Plan's investments were evaluated; and

- "[F]ail[ed] to remove the Committee as a fiduciary whose performance was inadequate."

(Doc. 1 ¶ 135.)  Because the prudence claim is plausible for the reasons discussed above, the court concludes that the allegations as a whole are sufficient at this stage to support a plausible monitoring claim.

In sum, at this early stage of the case—when access to the facts is asymmetrically distributed in favor of the defendant—*Iqbal* and *Twombly* do not require more.  The complaint meets plausibility standards because it alleges a breach of the statutory duty of care through fees that appear on the face of the complaint to exceed those paid by many similar institutions.

For these reasons, the court will deny the defense motion insofar as it is brought under Rule 12(b)(6).  Defendants' Motion to Stay Discovery and Postpone Filing of a Discovery Schedule/Order (Doc. 36) seeks that relief only "until the Court rules on" the Rule 12(b) motions.  The court will deny the Motion to Stay because this Order resolves those Rule 12(b) motions.

## Conclusion

Defendants' Motion to Dismiss (Doc. 14) is GRANTED insofar as it seeks dismissal of the claims for prospective injunctive relief for lack of standing.  The motion is otherwise DENIED.

Defendants' Motion to Stay Discovery and Postpone Filing of Discovery Schedule/Order (Doc. 36) is DENIED.  The parties shall file a proposed discovery order within 30 days.

Dated at Burlington, in the District of Vermont, this 30th day of January, 2024.

Geoffrey W. Crawford, Chief Judge
United States District Court

23